# EXHIBIT A

HARNEY PARTNERS | 30 YEARS

**PERSONAL & CONFIDENTIAL**

March 4, 2024

Mr. Dipak Jogia
Highmore Group Advisors
1180 Avenue of the Americas
8th Floor
New York, NY 10036

Dear Dipak:

Thank you for selecting **HMP Advisory Holdings, LLC, dba Harney Partners** ("HP") to provide advisory services to **Highmore Financing Co. IX, L.P.** (together with its Affiliates, "Client"). This letter agreement ("Agreement") will confirm Client's agreement to engage HP for the purpose of providing advisory services on behalf of Client, as provided below.

**SERVICES AND SCOPE**

As requested by Client and agreed to by HP, HP will provide Client financial advisory services as determined by Client, including but not limited to the following (the "Services"):

- Overseeing the liquidation of all assets of Banana Funding Group, LLC (BFG) to maximize recoveries;
- Managing liquidation costs and expenses in an efficient manner;
- Working with BFG personnel to help maximize collection of BFG MCA lender loans;
- Recommending any necessary or appropriate changes in BFG staffing or compensation during the liquidation period.
- Ongoing review and analysis of BFG collateral reporting, compliance certificates, required financial packages and other key materials provided to Client.
- Reviewing 13-week cash flow forecasting model to aid BFG in managing its cash position and forecasting liquidity needs on a weekly basis including a validation of underlying assumptions (collections of receivables, payroll and benefits disbursements, payments to vendors, debt service, etc.). Determine the amount and timing of any cash flow deficiencies.
- Confirming that proper controls are in place at BFG for receivables collection and cash applications.
- Other duties as agreed to by Client and HP from time to time.

The Services to be provided by HP will encompass all services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations and the scope of our engagement.

HP will require full and direct access to Client personnel, systems, records, bank accounts and key vendors. Client and HP agree that HP is authorized and directed to communicate directly with BFG personnel and such other third parties as deemed necessary by HP in its sole business judgment, regarding matters relevant to the Services.

As you know, the exercise of professional judgment requires an open dialogue. To provide Client with the best level of service, we will ask you to timely disclose all pertinent material information to us.

**FEES**

Our standard hourly rates for HP professionals are:

| | |
|---|---|
| President / EVP | $600 to $700 / hour |
| Managing Director | $500 to $600 / hour |
| Sr. Manager / Director | $400 to $500 / hour |
| Manager | $350 to $450 / hour |
| Sr. Consultant | $275 to $400 / hour |
| Support Staff | $180 to $300 / hour |

In this matter, it is understood that HP may need to draw upon a pool of talent to address specific Client needs. Client has further indicated that time is of the essence and that additional resources may be beneficial in accelerating Client's efforts.

Initially, we anticipate the Services to be performed by Tom Hidder ($550/hr), or another similarly qualified Managing Director, overseeing the engagement and a Senior Manager or Director ($450/hr) handling the majority of the day-to-day duties. As and if needed, Jim Harney or Jim Keane will be available to consult on overall strategic matters and/or discrete projects at $650/hr. Other HP professionals are available upon client consent at their standard rates.

HP determines additional staff rates based upon all relevant factors, which might include, for example, that staff's education, experience, or expertise within an industry. Because these factors may evolve over time, HP may modify its hourly rate from time to time, but no more often than every 6 months.

**RETAINER**

We will require an "evergreen" retainer in the amount of $15,000 (already paid), which is due via ACH or wire transfer upon execution of this agreement and will be fully replenished each billing period. At the end of the engagement, any retainer amounts remaining after all charges of HP have been satisfied will be refunded to the Client.

**BILLING**

HP shall invoice Client on a weekly basis for its professional services based upon the hourly rates set forth above, and such amounts are due within two days of receipt by wire transfer.

**ADDITIONAL TERMS**

This Agreement incorporates the Standard Terms and Conditions set forth in the attached *Exhibit "A."*

**APPROVAL**

If this letter accurately represents the agreement between the parties, please sign as indicated below and return a PDF copy to jharney@harneyparnters.com.

Sincerely,

[signature]

James E. Harney
*President*

**ACCEPTED AND AGREED**
**HIGHMORE FINANCING CO. IX, L.P.**

By: [signature] Date: March 7, 2024

Name/Title: Dipak Jogia, Manager

***EXHIBIT "A"***
*STANDARD TERMS AND CONDITIONS*

1. **SERVICES**:

HMP Advisory Holdings, LLC, dba Harney Partners ("HP") will use reasonable efforts to perform the agreed-upon Services more fully described in the engagement letter to which these Standard Terms and Conditions are attached as ***Exhibit "A."*** The Client will provide HP with all resources (physical and human) reasonably requested by HP to enable HP to perform the Services.

2. **ACCESS TO CLIENT PERSONNEL AND INFORMATION AND CLIENT REPRESENTATION CONCERNING INFORMATION PROVIDED TO HP:**

A. The Client will provide HP with full access to all Client books and records. Client authorizes HP directly to contact Client personnel, consultants, agents and other representatives (including those of the Client's attorneys subject to such safeguards as may be necessary to preserve applicable attorney-client privileged communications), and third parties as deemed necessary by HP in its sole business judgment regarding matters relevant to the Services.

B. The Client recognizes and confirms that, in acting pursuant to this engagement, HP will be using information in reports and other information provided by others, including, without limitation, information provided by or on behalf of the Company and other third parties. HP does not assume responsibility for and may rely, without independent verification, on the accuracy and completeness of any such reports and information. The Client also represents and warrants to HP that except as disclosed to HP in writing, all information provided or made available to HP by the Client, its' directors, officers, employees, representatives, attorneys and agents at any time shall (to the best of the Client's knowledge: i) be complete and correct in all material respects, and ii) not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements not misleading in light of the circumstances under which such statements are made. Client agrees that it shall notify HP if it learns subsequently that any information provided or made available to HP in accordance with this Agreement is incorrect, inaccurate, or otherwise should not be relied upon.

C. The services to the Client under this Agreement may include the preparation of recommendations, projections, and other forward-looking statements. The Client acknowledges that numerous factors may affect the Client's actual financial and operational results, and that these results may materially and adversely differ from the recommendations and projections prepared, in whole or in part, by HP. The Client acknowledges that in rendering its services under this Agreement, HP will be using and relying upon the information provided by Client, its directors, officers, employees, representatives and agents. Under any of the foregoing circumstances, the Client agrees that HP shall have no duty to verify independently the reliability, accuracy or completeness of such information. The Client also agrees that HP shall incur no liability to the Client or any individual or other entity that may arise if any

such information proves to be unreliable, inaccurate or incomplete.

3. **FEES AND EXPENSES**:

A. Unless otherwise specified in this Agreement, fees and expenses will be billed to the Client weekly. Expenses incurred by HP on behalf of the Client will be invoiced at the actual amount incurred and not marked up. All invoices are due upon receipt via ACH or wire transfer. All out-of-town travel time will be billed at 50% of such HP professional's applicable hourly billing rate.

B. In the event HP is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce HP's documents or HP's members, employees, agents, contractors, or representatives as witnesses with respect to HP's services for the Company, the Company will reimburse HP for its professional time and expenses at the current rates in effect at such time.

4. **NO THIRD PARTY BENEFICIARIES:**

The Client acknowledges that all information, whether written or oral, created, prepared, or compiled by HP in connection with this Agreement is intended solely for the benefit and use of the Client, provided however, HP acknowledges and agrees that Client shall utilize HP's work in negotiations with Client's creditors. No other individual or entity shall be entitled to rely on such information for any purpose. Client agrees that such information shall not be reproduced, disseminated, quoted or referred to at any time or in any manner other than to the Client's board of directors/trustees, officers, employees, representatives, attorneys, and other agents who have a need to receive such information, except upon HP's prior written consent. Without limiting the foregoing, the Client shall not (and shall not authorize any other individual or entity to) use HP's name or make available to third parties any information created, prepared, or compiled by HP under this Agreement for any reason, including obtaining or extending credit, offering or selling securities or other assets, or in any representations to third parties without HP's prior written consent. It is also expressly agreed that notwithstanding the above restrictions upon the Client's dissemination and use of information and work product, HP shall have no responsibility or liability relating directly or indirectly to such disclosure (whether authorized or unauthorized) by the Client concerning any information created, prepared, or compiled, in whole or in part, by HP pursuant to this Agreement, which may be disclosed only after prior written approval by HP or as required by applicable laws, or regulatory or administrative process, including stock exchange rules. The foregoing provisions shall not be construed or interpreted to prohibit references to HP's engagement under this Agreement in required public filings or court documents.

5. **TERMINATION:**

Unless otherwise specified in this Agreement, the engagement can be terminated by either party effective upon one-week written notice to the other party, provided that upon any such termination by the Client, the Client pays to HP all amounts due and owing hereunder prior to the effective date of termination. Either party shall have the right to terminate this engagement immediately if the other party materially breaches this Agreement. The terms

of this Exhibit "A" shall survive any termination or expiration of this Agreement or the engagement.

6. **<u>INDEPENDENT CONTRACTOR</u>**:

A. HP is an independent contractor under this Agreement, and accordingly, this Agreement shall not be an employment agreement. No one on behalf of any HP Party (as defined below), nor any employees, agents, or independent contractors thereof, shall be considered to be a director, officer, member, manager, partner, control person, employee, representative, agent, or insider of the Client, unless expressly agreed to in a writing signed by both Client and HP. As an independent contractor, HP will have exclusive control over the management and operation of HP, including hiring and paying the wages or other compensation of its personnel. Unless expressly provided otherwise in this Agreement, HP personnel that provide services to the Client under this Agreement may also provide services to other HP clients (past, present or future) in connection with unrelated matters. In addition, HP may utilize the services of qualified project employees, to assist HP with its performance of its services pursuant to this Agreement.

B. In rendering its services to Client hereunder, HP is not assuming any responsibility for the Client's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. HP shall not make decisions on behalf of or instead of the Client. The management and decision making of the Client shall, at all times, remain with the board of directors or managers of the Client and its equity owners in accordance with their independent business judgment. HP and Client confirm that each will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

7. **<u>NO FIDUCIARY RELATIONSHIP:</u>**

Nothing in this Agreement is intended to create, or shall be deemed or construed to create a fiduciary relationship between: (a) the Client, including without limitation, the Client's directors, officers, members, managers, partners, control persons, shareholders, employees, representatives, agents, or creditors, on the one hand: and (b) HP, HP's affiliates, and the respective directors, officers, members, managers, partners, control persons, shareholders, employees, representatives, independent contractors, attorneys, agents, successors or assigns of HP or HP affiliates (all of the foregoing in this subpart (b) collectively, the "HP Parties," and each a "HP Party") on the other hand.

8. **<u>LIMITATION OF LIABILITY:</u>**

Even if the remedies provided for in this Agreement fail of their essential purpose and even if HP has been advised of the possibility of the following damages, in no event shall any HP Party be liable to Client or to any other person or entity, under any equitable, common law, contractual, statutory, or other theory, for (i) any incidental, special, consequential, indirect, or punitive damages, (ii) any damages measured by lost profits, opportunities or goodwill, or (iii) any damages in excess of the fees paid by Client to HP during the six-month period

immediately preceding HP's actual receipt of Client's first express, written assertion of such claim.

9. **INDEMNIFICATION:**

As part of the consideration for the agreement of HP to furnish its services pursuant to this Agreement, Client agrees to indemnify and hold harmless the HP Parties to the fullest extent lawful from any and all claims, liabilities, losses, damages and expenses (or actions in respect thereof), as incurred, related to or arising out of or in connection with or related to this engagement, including, without limitation. any and all of such HP Parties' reasonable expenses incurred in connection with investigating, preparing, defending or settling any action or claim arising from or relating to such liabilities, including all of such HP Parties' reasonable legal fees and expenses: provided, however, that Client shall not be responsible for any losses, claims, damages, liabilities or expenses of any HP Party to the extent, and only to the extent, that it is finally judicially determined that they are due primarily to such HP Party's gross negligence or willful misconduct. The indemnity and expense reimbursement obligations set forth herein (i) shall be in addition to any liability Client may have to HP at common law or otherwise, (ii) shall survive the expiration of HP's engagement hereunder, (iii) shall apply to any modification of HP's engagement hereunder and shall remain in full force and effect following the completion or termination of the engagement as amended or modified, and (iv) shall be binding on any successor or assign of Client and its successors or assigns.

10. **NON-SOLICITATION:**

Unless otherwise set forth in this Agreement, during the term of this engagement and for 12 months thereafter, Client and any of its affiliated companies agree not to solicit any HP Party without HP's prior written consent, and HP agrees not to solicit Client's employees without Client's prior written consent. If an employee (or in the case of HP, any HP Party) of one party (the "First Employer") becomes employed or contracted by the other party (the "Second Employer"), and 180 days have not elapsed since such employee (or Affiliate) was last employed by or provided services as a contractor to the First Employer, then the Second Employer shall be conclusively deemed to have breached its obligations under this section. As liquidated damages for such a breach, the Second Employer shall pay the First Employer an amount equal to forty percent (40%) of the total cash compensation reasonably anticipated to be paid by the Second Employer to such employee or contractor during the first year of such employment or contract relationship with the Second Employer. For purposes of this calculation, the parties agree that such payment shall be due within 30 days after such employment or contract relationship commences, and to conclusively assume that all base salary, discretionary bonuses (in the targeted amount), contract payments (based on reasonable estimates of hours worked or jobs performed), commissions (based on reasonable performance), and other amounts are earned and paid for one entire year, without regard to whether any component of such compensation is discretionary or whether such employment or contract relationship is at will or for a definite term less than one year.

11. **TRADEMARK LICENSE**:

HP shall have the right, during the term of this agreement and thereafter, to disclose Client's relationship as a Client or former Client of HP and to use Client's trade names, trademarks,

service marks and logos (collectively, "Client's Marks") for that purpose in any medium. HP shall use Client's Marks in accordance with any commercially reasonable written trademark usage policies provided by Client to HP from time to time. Nothing herein shall affect Client's ownership of Client's Marks.

12. **GOVERNING LAW; VENUE; ARBITRATION; ATTORNEY'S FEES**:

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS (EXCEPT ITS CONFLICTS OF LAWS PRINCIPLES). THE EXCLUSIVE VENUE TO RESOLVE ANY DISPUTE RELATED IN ANY WAY TO THIS AGREEMENT OR THE SERVICES PROVIDED OR TO BE PROVIDED BY HP TO CLIENT SHALL LIE IN COOK COUNTY, ILLINOIS. ANY DISPUTE RELATED IN ANY WAY TO THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION (EXCEPT TO THE EXTENT THEY CONFLICT WITH THIS AGREEMENT). THE PREVAILING PARTY IN ANY DISPUTE RELATED IN ANY WAY TO THIS AGREEMENT SHALL BE ENTITLED TO RECOVER ITS REASONABLE ATTORNEY'S FEES AND REASONABLE OUT-OF-POCKET EXPENSES INCURRED IN THE PROSECUTION OR DEFENSE OF CLAIMS IN SUCH DISPUTE. IN THE EVENT ARBITRATION IS UNAVAILABLE TO RESOLVE A DISPUTE, HP AND CLIENT HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF THE ENGAGEMENT PROVIDED FOR IN THIS AGREEMENT.

13. **MISCELLANEOUS**:

If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be void, invalid, or otherwise unenforceable, in whole or part, the remaining terms, provisions, covenants and restrictions contained in this Agreement shall remain in effect. Amounts past due under this Agreement shall accrue interest at the rate of 18% per year, or the maximum rate allowed by law, whichever is less. Client shall pay (or if HP pays, reimburse HP for) any applicable sales, use or similar tax imposed in connection with any sale of goods or services by HP to Client. This Agreement supersedes any prior agreement, understanding, or representation between HP and Client, and can only be modified by a written document signed by both HP and Client.

[End of Exhibit A]